**William E. SMITH, Plaintiff,**

v.

**Patrick D. DEERING, Michael J. Bowers, Lee J. Sweat, Jr., and Joe B. Jackson, Jr., Defendants.**

Civ. A. No. 293–87.

United States District Court,
S.D. Georgia,
Brunswick Division.

Dec. 20, 1994.

820

Stephen L. Berry, St. Marys, GA, Taylor
W. Jones, Myles E. Eastwood, Rebecca A.
Copeland, Atlanta, GA, for plaintiff.

Grace Evans Lewis, John C. Jones,
Charles M. Richards, Atlanta, GA, James A.
Bishop, Carl Foster Lindberg, Brunswick,
GA, for defendants.

### ORDER

ALAIMO, District Judge.

The Sheriff of Camden County, Georgia, William E. Smith ("Smith"), was arrested pursuant to an indictment that was later *nol prossed.* On June 29, 1993, Smith filed this federal action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, against Defendants, Patrick D. Deering ("Deering"), Michael J. Bowers ("Bowers"), Lee J. Sweat, Jr. ("Sweat"), and Joe B. Jackson, Jr. ("Jackson"). This case is presently before the Court on Defendants' Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed below, Defendants' Motion for Summary Judgment will be GRANTED on the basis of qualified and absolute immunity. Accordingly, the Court finds it unnecessary to rule on Smith's Motion for Partial Summary Judgment.

### FACTS

Plaintiff, Smith, is and has been for several years, the Sheriff of Camden County, Georgia. During 1991 and 1992, the Georgia Bureau of Investigation ("GBI") conducted an investigation of Sheriff Smith which led to a search of his residence and his subsequent arrest in July of 1992. Although the parties vehemently disagree about most of the facts surrounding this case, the Court will attempt to relate the undisputed events below. If a particular fact is disputed, it is so noted.

On November 15, 1990, Defendant, Jackson, of the GBI received a letter from Judge A. Blenn Taylor of the Superior Court of Camden County. In this letter, Judge Taylor discussed allegations he had received concerning members of the Camden County Sheriff's Office. Among these allegations was the "use of inmates confined to Camden County Jail for work on private projects." Judge Taylor requested the GBI to inquire into the matter. GBI Agent Yeomans investigated these allegations but found no evidence of wrongdoing. Agent Yeomans observed the Sheriff's home on four days in December of 1990, but did not observe any inmates working on the house. Yeomans requested that the case be closed.

On June 15, 1991, Sheriff Smith removed inmate Bobby Graham from the Camden County Jail and transported him to the residence of Ms. Dale Bristol, the Sheriff's girlfriend. Bobby Graham cleaned and waxed Ms. Bristol's floor. The Sheriff paid Bobby Graham $20.00, and then transported him back to the jail. That same evening, Bobby Graham was removed from his cell to wash a private vehicle for Deputy Jason Merrow. He was given the keys to this vehicle. Graham, without authority, departed from the Camden County Public Safety Complex in the car he was supposed to be washing. At approximately 6:46 P.M., Graham was involved in an accident on U.S. 17 between Kingsland and Woodbine. As a result of the accident, Graham was charged with (1) following too close, (2) driving without a license, (3) driving while under the influence of alcohol, (4) theft of a motor vehicle, and (5) escape. The parties dispute how Graham obtained alcohol that evening.

After the Bobby Graham incident, the GBI created the Crooked River Task Force to investigate allegations against Sheriff Smith. Defendants, Sweat and Jackson, special agents for the GBI, supervised the task force. Defendant, Deering, an assistant attorney general, served as the prosecutor. Defendant, Bowers, as Attorney General of Georgia, supervised the investigation. The parties dispute the nature and extent of each Defendants' involvement in the investigation.

The investigation took place between August of 1991 and late January of 1992. During this time period, investigators interviewed Camden County inmates, former Camden County inmates, employees of the Camden County Sheriff's department, and other individuals. The GBI documented these interviews by writing summaries and placing these summaries in GBI Investigative File # 14–0085–25–92. Also, at various points during the investigation, Defendants made statements to the press which tended to incriminate Sheriff Smith.

In March of 1992, Smith announced his intent to seek reelection as Sheriff of Camden County. A few days later, search warrants were obtained for Sheriff Smith's residence, the Camden County Public Safety Complex (which includes the Sheriff's office) and Dale Bristol's residence. Defendant, Sweat, drafted the search warrant affidavit and presented it to the Magistrate. On March 13, 1992, officials carried out the searches. During the search of the Sheriff's Department, Defendants obtained several letters regarding writs of execution on bond forfeitures by criminal defendants. In Georgia, these writs are commonly called bond forfeiture "fi. fas." (Fieri Facias). Defendants also found a single box full of unexecuted fi. fas.

After further investigation, Defendants began drafting an indictment against Sheriff Smith. On July 1, 1992, Defendant, Deering, filed a document with the Clerk of Superior Court of Camden County, entitled "Notice of Indictment". Smith claims that in order to file the indictment on that date, Defendants had to take the unusual step of opening the Clerk's Office and stamping in the document at 7:35 P.M. The proposed indictment contained nine counts: six regarding unlawful use of inmate labor, one regarding violation of oath of office for failure to execute bond forfeiture fi. fas., one regarding theft of county funds from the vending machine account, and one regarding a false written statement to be signed by Bobby Graham. On July 1 or 2, Defendant, Deering, contacted the media, including but not limited to the *Florida Times Union*, and informed them that the proposed indictment was available.

The Notice of Proposed Indictment was also served upon Sheriff Smith as required by Georgia law.[1] Before the indictment was presented to the Grand Jury, however, Attorney General Bowers decided to postpone presenting any indictment counts dealing with inmate labor. He instructed Deering to proceed with presenting the other three counts of the indictment.

Approximately two weeks after Deering filed the Notice of Proposed Indictment, he presented it to the Camden County Grand Jury. A few minutes before the Grand Jury proceedings commenced, Defendants informed Sheriff Smith and his attorney that the inmate labor charges would not be presented and that the list of forfeited bail bond fi. fas. which the Sheriff failed to collect had been reduced from 177 to 64.

The redacted indictment actually considered by the Camden County Grand Jury included three counts. Count I charged Smith with the offense of Violation of Oath by Public Officer for failure to collect 64 bail bond fi. fas. Count II charged Smith with Theft by Taking for mishandling the money in the vending machine account, and Count III charged him with willfully making a false writing to be signed by Bobby Graham.

Pursuant to Georgia law, Smith was allowed to have counsel present and give a sworn statement to the Grand Jury. He made this statement on his own behalf, without being subject to cross-examination. No time limit was imposed, and he was free to present to the Grand Jury any exculpatory information he desired to present. Defendant, Sweat, testified for the prosecution.

After the testimony, the Grand Jury returned a "No Bill" on Counts II and III. As to Count I, the Grand Jury returned a "True Bill," thereby indicting Smith for violating his oath of office.

After the indictment was published in open court, the presiding judge issued a bench warrant for Smith's arrest. Immediately upon issuance of the bench warrant, Smith

---

1. O.C.G.A. § 45–11–4 requires that a notice of proposed indictment must be served upon a public official at least fifteen days prior to its being presented to the Grand Jury.

accompanied GBI agents and entered a GBI car. GBI policy requires that persons being transported in GBI cars while under arrest must be handcuffed. However, the GBI agents waited until they had driven out of sight of the courthouse before putting handcuffs on Smith. Agents handcuffed Smith's hands in front of his body, rather than the more usual and more uncomfortable method of handcuffing the subject's hands behind his body.

Smith was transported in the GBI car from the Camden County Courthouse to the Glynn County Detention Center. The trip took approximately 30 to 35 minutes. At the Glynn County Detention Center, Sweat drove the GBI car into the "sally port," a sheltered entryway for vehicles. Doors were closed, shutting off the view of the GBI car from the outside. Smith was then taken into the jail for booking. At the Glynn County Jail, Smith was photographed, fingerprinted, processed and placed in a holding cell.

The parties dispute how long Smith was detained at the jail before being released on bond. Defendants claim he was released within approximately one hour, but Smith claims he remembers being in custody substantially longer than one hour. Smith was eventually released on a $5,000.00 bond, subject to the requirement that he appear in court on some unknown date in the future when his trial might be set. He was also not allowed to leave the State of Georgia.

On July 22, 1992, Deering and Jackson made statements to the *Camden County Tribune* that the counts for inmate labor had not been dropped, but were simply not presented for Grand Jury consideration at that time. Other statements suggested that "policing the police" was necessary.

Later in July, Smith won the Democratic primary for Sheriff, which was tantamount to reelection because there was no Republican candidate. Thereafter, the Governor of Georgia convened a commission to determine if Smith should be removed from office. The commission recommended that Smith not be removed. On April 9, 1993, the one count indictment against Smith for failure to collect bond forfeitures was *nol prossed.*

Several weeks later, Smith filed this § 1983 action claiming that Defendants conspired to discredit and stigmatize.him in an effort to thwart his chances at reelection in 1992 by overtly accusing him of crimes for which Defendants had no basis and for which Defendants had no evidence. Smith also claims that Defendants conspired to intimidate, extort and threaten potential witnesses, including Deputy Sheriffs, Camden County inmates, and former Camden County inmates. He claims that Defendants deliberately misled the Magistrate in order to obtain a search warrant, and deliberately mislead the Grand Jury in order to obtain an indictment.

On August 2, 1993, Defendants filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Surviving that motion are Smith's § 1983 claims for: (1) bad faith prosecution; (2) arrest without probable cause; (3) deprivation of liberty without due process; (4) unlawful search and seizure of property; and (5) conspiracy to commit the foregoing. *See* Order, CV 293–87 (Nov. 10, 1993). Defendants have now filed a renewed motion to dismiss or, in the alternative, for summary judgment, seeking dismissal of all remaining claims. In addition, Smith has filed a motion for partial summary judgment seeking a decision in his favor that Defendants did not have probable cause to (1) search his personal residence or (2) arrest and detain him because the indictment was dishonestly obtained.

## DISCUSSION

### I. MOTION TO DISMISS FOR FAILURE TO MEET PLEADING REQUIREMENTS

Defendants argue that Smith has failed to plead his claims in accordance with the heightened pleading requirements applicable to civil rights cases. *Fullman v. Graddick,* 739 F.2d 553, 556–557 (11th Cir.1984). Smith argues that there is not a heightened pleading standard for civil rights cases, citing the Court's decision in *Mastroianni v. Deering:*

> In *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* — U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), the Supreme Court rejected the use of a heightened pleading standard in

§ 1983 cases involving municipal liability, but stated that it had no occasion to consider whether a heightened pleading standard should be used in § 1983 cases involving individual officers. In its analysis, however, the Court noted that the Federal Rules of Civil Procedure impose a particularity requirement for only two circumstances—fraud and mistake—and reasoned that if it is desirable to require particularity in additional circumstances, such changes should be made by amending the Federal Rules, and not by judicial interpretation. —— U.S. at ——, 113 S.Ct. at 1163, 122 L.Ed.2d at 524.

*Mastroianni v. Deering,* 835 F.Supp. 1577, 1581 n. 2 (S.D.Ga.1993).

█ Regardless of whether there is indeed a heightened pleading requirement for civil rights claims, the Court notes that it has already considered challenges to the pleadings in deciding Defendants' motion under 12(b)(6) of the Federal Rules of Civil Procedure. By Order dated November 10, 1993, the Court allowed the following claims to proceed: (1) § 1983 bad faith prosecution; (2) § 1983 arrest without probable cause; (3) § 1983 deprivation of liberty without due process; (4) § 1983 unlawful search and seizure of property; and (5) § 1983 conspiracy to commit the foregoing. Implicit in this holding is Smith's satisfaction of the applicable pleading requirements as to these claims.

## II. ABSOLUTE IMMUNITY

█ Defendants, Bowers and Deering, argue that absolute immunity shields them from all liability in this case. Again, the Court has already considered Defendants' claims of absolute immunity:

> The Court determines that there is absolute immunity for Deering and Bowers in their presentations to the grand jury (and for Sweat in his testimony before the grand jury), their application for the search warrants, and Deering's filing of the "Notice of Indictment." No other alleged acts by Bowers and Deering enjoy the same shield.

Order, CV 293-87 at 8 (Nov. 10, 1993). This ruling, of course, still stands.

Defendant, Sweat, argues for an extension of this ruling. He claims that absolute immunity shields him from liability for any claim arising out of his search warrant affidavit. In *Malley v. Briggs,* however, the Supreme Court held that "in the case of the officer applying for a warrant, it is our judgment that the judicial process will on the whole benefit from a rule of qualified immunity rather than absolute immunity." 475 U.S. 335, 343, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986). While *Malley* involved an application for an *arrest* warrant, the Court noted that "the distinction between a search warrant and an arrest warrant would not make a difference in the degree of immunity accorded the officer who applied for the warrant." *Id.* at 344 n. 6, 106 S.Ct. at 1098 n. 6. Accordingly, Sweat is only entitled to qualified immunity with respect to his application for the search warrant.

## III. SUMMARY JUDGMENT

█ All parties in this case have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Summary judgment requires the movant to establish the absence of genuine issues of material fact, such that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). In this case, if Defendants are entitled to qualified immunity, they are also entitled to judgment as a matter of law. *See Alexander v. University of North Florida,* 39 F.3d 290 (11th Cir.1994) ("[Q]ualified immunity for government officials is the rule, liability and trials for liability the exception."). Accordingly, the existence of qualified immunity is a legal question which is properly decided on summary judgment. *Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1567 n. 2 (11th Cir.1992). Indeed, deciding qualified immunity cases at the summary judgment stage furthers the purpose of this defense by keeping the public official "out of the courtroom, free to exercise discretionary duties under clearly established law without the constant threat of lawsuits." *Ansley v. Heinrich,* 925 F.2d 1339, 1345 (11th Cir.1991). As the Supreme Court has noted, qualified immunity "is an immunity from suit

rather than a mere defense to liability; and . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

■ While the existence of factual disputes does not preclude summary judgment on qualified immunity, *McDaniel v. Woodward,* 886 F.2d 311, 313 (11th Cir.1989), all reasonable inferences will be made in favor of the non-movant. *Adickes,* 398 U.S. at 158–59, 90 S.Ct. at 1608–09; *see also, Bennett v. Parker,* 898 F.2d 1530, 1536 n. 2 (11th Cir.1990) (Tjoflat, C.J., concurring) ("The court considers in the light most favorable to the plaintiff all facts fairly inferable from the record—regardless of factual disputes—and decides whether, under those facts, defendant's conduct violated law clearly established at the time.").

## IV. *QUALIFIED IMMUNITY*

As discussed below, Defendants are entitled to qualified immunity with respect to all of Smith's § 1983 claims.

### A. *Unlawful Search and Seizure*

In March of 1992, Defendant, Sweat, began drafting a search warrant affidavit for the search of Sheriff Smith's personal residence.[2] On March 13, 1992, Smith's residence was searched pursuant to a search warrant obtained through Sweat's affidavit. Smith claims that the search violated his Constitutional rights under the Fourth Amendment. Specifically, Smith argues that Defendants lacked probable cause for the search because the search warrant affidavit prepared by Sweat contained material misrepresentations and material omissions. In other words, Smith claims that Sweat deliberately or recklessly misled the Magistrate. Defendants have raised the defense of qualified immunity.

■ The United States Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages inso-

far as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Stough v. Gallagher,* 967 F.2d 1523, 1525 (11th Cir.1992). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39. The test is now called the "objective reasonableness" standard. *Stough,* 967 F.2d at 1525.

■ In the Eleventh Circuit, the "objective reasonableness" standard is applied through a two-part analysis:

(1) The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."

(2) Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. The burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional laws."

*Id.* at 1526 (quoting *Rich v. Dollar,* 841 F.2d 1558, 1563–64 (11th Cir.1988)).

The parties here do not dispute that Defendants were acting within the scope of discretionary authority. The remaining issue is whether Defendants' actions violated clearly established Constitutional law.

### 1. Clearly Established Law

■ Certainly, a search of Smith's residence without probable cause gives rise to a cause of action under § 1983. However, as recently reiterated by the Eleventh Circuit in *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146 (11th Cir.1994), the Court cannot rely on general propositions in deciding whether the law is clearly established:

---

**2.** The affidavit also included information supporting the search of the Camden County Public

Safety Complex and Dale Bristol's home.

General propositions have little to do with the concept of qualified immunity. If case law, in factual terms has not staked out a bright line, qualified immunity almost always protects the defendant. The line is not to be found in abstractions—to act reasonably, to act with probable cause, and so forth—but in studying how these abstractions have been applied in concrete circumstances.

*Id.* at 1150 (citations and footnotes omitted).

■ In March of 1992, it was clearly established that a law enforcement officer violates the Constitution when he submits a materially misleading search warrant affidavit to a Magistrate. Under *Lassiter*, however, "this general proposition is, in reality, a useless bit of abstract information, giving no · practical instruction to defendants at the time, and in turn, having almost nothing to do with whether qualified immunity would protect defendants' acts." *Id.* at 1151. Accordingly, the Court must articulate a more particularized factual situation to evaluate (which, in this case, is difficult due to Smith's shotgun approach). As best the Court can determine, Smith has identified three misrepresentations and four omissions in Defendant, Sweat's, affidavit which he contends strips the search warrant of probable cause. The particular misrepresentations and omissions are discussed below. For present purposes, however, the Court finds that Smith has failed to carry his burden of establishing that Defendants' alleged conduct violated clearly established law. Defendants could not have known in March of 1992 that the particular misrepresentations and omissions in Sweat's affidavit were of such a nature as to render the affidavit materially misleading, thereby destroying probable cause.

## 2. Objective Reasonableness

■ It is clear that Defendants enjoy qualified immunity if the search was objectively reasonable. *See Harris v. Coweta,* 21 F.3d 388, 390 (11th Cir.1994) (qualified immunity depends on "whether the law allegedly violated was clearly established at the time

of the complained-about conduct, and, if it was, whether the official's conduct was objectively reasonable in light of the information known to the official at the time."). Actual probable cause is not necessary for a search to be objectively reasonable under the *Harlow* test. *Lowe v. Aldridge,* 958 F.2d 1565, 1570 (11th Cir.1992). Rather, "when a law enforcement officer seeks summary judgment on the basis of qualified immunity, we must only ask whether, viewing the facts most favorably to the non-movant, there was arguable probable cause." *Swint v. City of Wadley, Ala.,* 5 F.3d 1435, 1443 (11th Cir. 1993). Under an arguable probable cause standard, Defendants are entitled to qualified immunity if a reasonable officer could have believed that probable cause existed. *Id.* As the Supreme Court has held, "only where the warrant [affidavit] is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Malley v. Briggs,* 475 U.S. 335, 344–45, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986) (citations omitted).

### a. *Franks v. Delaware*

■ In the instant case, however, the Court cannot evaluate the search warrant affidavit on its face because Smith has alleged that it contains material misrepresentations and omissions. Thus, before evaluating the affidavit for the purposes of qualified immunity, the Court must apply the standard set forth in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).[3] In *Franks,* the Court held that if an officer, in an affidavit supporting a warrant, makes a false statement knowingly and intentionally, or with reckless disregard for the truth, the false statements must be disregarded in determining whether the affidavit is sufficient to support a finding of probable cause. *Id.* at 171–72, 98 S.Ct. at 2684–85. The holding in *Franks* applies to omissions as well. *United States v. Thompson,* 615 F.2d 329 (5th Cir.1980). Accordingly, in determining qualified immunity, a court should exclude any allegedly false material, add any omitted

---

**3.** Although the *Franks* standard developed in the criminal context, it applies in civil rights cases as well. *See, e.g., Kelly v. Curtis,* 21 F.3d 1544,

1554 (11th Cir.1994) (applying *Franks* to a § 1983 claim for malicious prosecution).

material and then determine whether the contents of the "corrected affidavit" are "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley v. Briggs*, 475 U.S. 335, 344–45, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986) (citations omitted).

After considering the alleged misrepresentations and omissions, the Court finds that it was not objectively unreasonable for Defendants to believe that there was probable cause to search Smith's residence. Accordingly, Defendants are entitled to qualified immunity.

### b. *Misrepresentations*

The GBI sought to search Smith's residence to gather evidence regarding Smith's use of inmate labor in the construction and maintenance of his personal residence. The warrant affidavit states, in part:

> Subsequent investigation by the GBI has revealed for the entire period of time Sheriff Smith has been in office and as custodian of inmates of the penal institution, known as Camden County Jail, Sheriff Smith did use inmates for purposes resulting in private gain. . . .
>
> . . . . .
>
> During the fall and winter of 1990 Sheriff Smith as custodian of inmates of the Camden County Jail built a personal residence at Harrietts Bluff in Camden County, Georgia, utilizing labor ... from inmates currently incarcerated in the Camden County Jail at various stages of construction. . . .

(Lee Sweat Aff. Ex. A at 2.)

Smith does not directly attack the above statements as false or misleading.[4] Rather, Smith attacks several collateral statements which are not essential to probable cause.

### i. Misrepresentation Regarding the Applicability of O.C.G.A. § 42–5–37(a)

Smith claims that Sweat deliberately misrepresented that O.C.G.A. § 42–5–37(a) applied to his use of inmate labor. In the search warrant affidavit, Sweat stated that Smith's alleged use of inmate labor violated two Georgia statutes: O.C.G.A. § 42–1–5 and O.C.G.A. § 42–5–37(a). Under O.C.G.A. § 42–1–5, it is a misdemeanor "for a custodian of an inmate of a penal institution to use such inmate or allow such inmate to be used for any purpose resulting in private gain to any individual." Under O.C.G.A. § 42–5–37, it is a felony for any "warden, superintendent, deputy, inspector, physician, or any officer or other employee who has charge, control, or direction of inmates" to be "interested in any matter whatever in the work or profit of the labor of any inmate."

██ Sweat included both of these statutes because prosecutors told him these statutes applied. Several months later, however, Attorney General Bowers realized that O.C.G.A. § 42–5–37(a) only applies to the use of inmate labor in state or county "correctional institutions." The Camden County Jail is not a "correctional institution." Accordingly, O.C.G.A. § 42–5–37(a) does not proscribe Smith's alleged use of inmate labor. Bowers admitted this in his deposition. (Bowers Dep. at 40, 44–47)

Smith claims that Bowers' admission retroactively renders the search warrant affidavit deliberately misleading. Smith implies that Sweat included O.C.G.A. § 42–5–37(a) in the affidavit even though he knew this statute did not apply. Even if Sweat did intentionally misrepresent the applicability of O.C.G.A. § 42–5–37(a), the Court finds it inconsequential because the parties agree that O.C.G.A. § 42–1–5 criminalizes Smith's use of inmate labor. Simply because Smith's conduct violates only one statute instead of two does not

---

**4.** In his deposition, Sheriff Smith admitted that inmates helped him unload bricks during the construction of his house and later, inmates helped him move from his old house to his new house. (Smith Dep. at 120–123) Also, it is undisputed that on June 15, 1991, Sheriff Smith took inmate Bobby Graham from the Camden County Jail to the residence of Ms. Dale Bristol, a woman whom the Sheriff was dating. Graham cleaned and waxed Ms. Bristol's floor, and Sheriff Smith paid Graham $20.00 for this work. It is also undisputed that Sheriff Smith stayed at Ms. Bristol's house while Graham was doing this work. When the work was complete, Sheriff Smith transported Graham back to the Camden County Jail.

negate probable cause. *See United States v. Ofshe*, 817 F.2d 1508, 1513 (11th Cir.1987) ("Insignificant and immaterial misrepresentations or omissions will not invalidate a warrant.").

### ii. Misrepresentation Regarding Michael Stanton

The second statement Smith attacks is Sweat's reference to inmate Michael Stanton. In the affidavit, Sweat stated that "inmate Bobby Graham was utilized ... to assist in the construction *along with inmate Michael Stanton* and others not yet identified." (Lee Sweat Aff. Ex. A at 3) (emphasis added). Smith claims that the emphasized portion of this statement is false.

■ When questioned by the GBI prior to the search, Michael Stanton denied participating in inmate labor. (Tammy Griffin Aff., appending GBI Investigative File # 14–0085–25–92 at 131) Inmate Bobby Graham, however, stated that Stanton did participate in inmate labor. (*Id.* at 323–324) While this conflicting testimony may raise an issue of fact as to whether Michael Stanton participated in inmate labor (which is not the issue in this case), it does not establish that Sweat's statement about Michael Stanton is false. Nevertheless, assuming this statement is indeed false and excising it from the affidavit pursuant to *Franks*, arguable probable cause remains. The affidavit still contains some indicia of probable cause such that a reasonable officer could have believed that probable cause existed.

### iii. Misrepresentation Regarding Camden County Deputies

The final alleged misrepresentation in the affidavit involves Sweat's reference to interviews with Camden County Deputies. The affidavit states, in part:

> Interviews with Camden County deputies, who will remain confidential at this time for their security, indicate inmates were being removed from the jail to work at the Sheriff's house, to move the Sheriff from his old residence on Fourth Street in Woodbine, Georgia, to the Harrietts Bluff residence, and for further upkeep of the Harrietts Bluff residence.

. . . . .

> Interviews with Camden County Deputies, who will remain confidential at this time for their security, revealed the practice of using inmates for the Sheriff's private gain was so common place that no particular attention was noted and no attempt was made to question the Sheriff.

(Lee Sweat Aff. Ex. A at 4.)

■ It is difficult to determine what Smith considers to be "false" about the above statements. Smith seems to argue that the reference to Camden County deputies in the plural is false because Sweat only obtained information from a single deputy. Smith, however, has confused Sweat's reference to "Camden County deputies" with one to "confidential informants." For example, in his brief, Smith claims that Sweat "repeatedly used the term 'informants' in the plural." (Pl.'s Br. in Supp. of Mot. for Partial Summ. J. at 30) The word "informants," however, does not appear in the search warrant affidavit.

Nevertheless, Smith seeks to prove that the GBI had only one "confidential informant" during the investigation of Sheriff Smith. This type of proof misses the mark. Even if the GBI did indeed have only one confidential informant, this does not mean that the GBI only interviewed one Camden County deputy. In fact, the GBI Investigative File reveals that the GBI interviewed *two* Camden County deputies: Stanley Smith and Stanley Edgy. (Tammy Griffin Aff., appending GBI Investigative File # 14–0085–25–92 at 131 & 185) Both deputies were interviewed in reference to Smith's use of inmate labor. Accordingly, the Court cannot reasonably infer that Sweat's reference to "interviews with Camden County deputies" is false.

### c. *Omissions*

The information Sweat allegedly "omitted" from the search warrant affidavit has little to do with probable cause and, thus, does not strip the Defendants of qualified immunity.

#### i. Omission of Intimidation of Witnesses

██ Smith claims that Sweat failed to tell the Magistrate that the GBI "intimidated" and "threatened" Inez Frazier, Robert Mastroianni, Charlie Easterling, Kenneth McCarthy, Brenda Gail Nanson and James Zow. The Court fails to see the relevance of this "omission" because none of these people has anything to do with the search warrant affidavit. Their names are not mentioned and none of the statements in the search warrant affidavit is attributable to them.

#### ii. Omissions Involving Bobby Graham

Smith also alleges that Sweat failed to tell the Magistrate that Bobby Graham had been polygraphed. Including this information would actually have strengthened probable cause because Bobby Graham *passed* the polygraph exam regarding his participation in inmate labor at Smith's house.

Smith also claims that Sweat failed to tell the Magistrate that Bobby Graham was intimidated into giving false testimony against Sheriff Smith. In supporting this allegation, Smith relies on the following excerpts from Graham's deposition:

Well basically that if I didn't give them the statement, that I would stay in lock-down until I was tried on my charges. Then after I would go to prison on just the one charge, just like the judge told me at my first hearing. So I didn't have—I was like—I really didn't know what to do except go ahead and just go with them, go with the flow.

\* \* \* \* \* \*

Well, they wanted me to say anything that would incriminate the sheriff, you know, anything like we—for instance, a few houses that we went to in Brunswick over here—this guy built a house, so we went over there and we did real work, but we got paid for it. They wanted me to say that we built the house—you know, two or three houses over there, the sheriff's house and the preacher's house to incriminate the sheriff to make it look—they said that he got paid for the houses that we built, but we didn't build it. But I think it's in the statement where I said that we did

build the house. Even on his house, they tried to get me to say that I worked on his house, but I never did.

\* \* \* \* \* \*

Q: And even after you told them that they were not true, did they still want you to say those things anyway?

A: Yes sir. It didn't matter whether they were true or not to them.

(Bobby Graham Depo. at 33–35.)

As Defendants point out, Bobby Graham did not give the above testimony until 1994, so Sweat could not have included it in the search warrant affidavit in March of 1992. Furthermore, while the above excerpts support an allegation that GBI agents intimidated Bobby Graham, Smith has failed to show how this intimidation translates into a Fourth Amendment violation. Perhaps Smith suggests that the intimidation caused Graham to lie and that said lies formed the basis for the search of his residence. Smith, however, admits that most of the statements regarding Bobby Graham in the search warrant affidavit are true. The affidavit states that on June 15, 1991, Sheriff Smith took inmate Bobby Graham from the Camden County Jail to the residence of Ms. Dale Bristol, a woman whom the Sheriff was dating. Graham performed manual labor at the residence and was then transported back to the jail. Sheriff Smith admits that these statements are true. Nevertheless, even if a statement concerning intimidation is added to the affidavit (which might cause the Magistrate to disregard any statement regarding Bobby Graham), some indicia of probable cause remains, for Bobby Graham's participation in inmate labor is not the sole basis for the search of Smith's residence.

#### iii. Omission of Names of Witnesses and Statements of Reliability

Smith claims that Sweat omitted the names of the witnesses who gave testimony against him. In the search warrant affidavit, Sweat discussed the various facts supporting the search of Smith's residence, but he did not name the specific person who contributed each fact. For example, the affidavit states that "[d]uring the fall and winter of 1990, Sheriff Smith ... built a personal residence

..., utilizing labor and expertise from inmates currently incarcerated in the Camden County Jail...." (Lee Sweat Aff. Ex. A at 2) Sweat, however, does not specifically name the persons who provided this information. In response to the Plaintiff's Motion for Partial Summary Judgment, Sweat filed an affidavit naming several inmates who testified that they participated in inmate labor. For example, inmate Shawn Roberts stated that he helped the Sheriff move furniture from his old house to his new house, inmate Lee Riddle stated that he installed some shelves in the Sheriff's new house, and inmate Carl Isaac stated that he and another inmate cleaned out the bottom floor of the Sheriff's new house.

▮ Smith does not claim that the statements made by these various inmates are false. He simply argues that Sweat should have told the Magistrate their names. Smith has not cited and the Court has been unable to locate any authority which would require a search warrant affiant to name those who contributed information to his investigation. Rather, the affiant need only provide "sufficient information for a Magistrate to determine that there is a fair probability that ... evidence of a crime will be found in a particular place." *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991); *see also United States v. Johns*, 948 F.2d 599, 606 (9th Cir.1991) ("Not all information in the government's possession need be included in the warrant affidavit.").

▮ Smith also argues that Sweat failed to include a factual statement regarding the reliability of his sources. Although no cases are cited by Smith in support of this argument, the Court recognizes that in narcotics cases, search warrant affidavits based on statements from confidential police informants should contain some statement as to that informants' reliability so as to "usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." *Illinois v. Gates*, 462 U.S. 213, 230, 76 L.Ed.2d 527, 543, 103 S.Ct. 2317 (1983). As discussed above, however, this case involves ordinary eyewitnesses such as former inmates and county employees, not "confidential police informants." Accordingly, statements of reliability are not compulsory. *See Jaben v. United States*, 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965) ("[U]nlike narcotics informants, for example, whose credibility may often be suspect, the sources in this ... case are much less likely to produce false or untrustworthy information. Thus, whereas some supporting information concerning the credibility of informants in narcotics cases ... may be required, such information is not so necessary in the context of the case before us.").

### iv. Omission of Statement Regarding Location of Evidence

Finally, Smith argues that "no factual statement with any type of particularity at all is given in the search warrant affidavit explaining to the Magistrate why information about bail bond fi. fas., vending machine accounts, and other official Sheriff's Department records, normally located in the Sheriff's Department file cabinets, would be located at that time at the Plaintiff's home." (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ.J. at 20)

▮ Under a commonsense interpretation of the affidavit, the Court finds that the following statement adequately explains to the Magistrate why evidence of a crime would be found at Sheriff Smith's residence:

> Affiant states through knowledge and belief that Sheriff Smith currently resides at the Harrietts Bluff residence in Camden County, Georgia, and that residence being the sole depository known to affiant for personal documents and being the residence constructed in violation of Official Code of Georgia Annotated section 42–1–5 and 42–5–37(a) and the repository of personal documents supporting this allegation.

(Lee Sweat Aff. Ex. A at 9); *See United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir.1994) ("Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hyper-technical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process...").

### 3. Conclusion

In conclusion, Defendants are entitled to qualified immunity for the search of Smith's personal residence. After applying the standard in *Franks v. Delaware,* the Court finds that under *Malley v. Briggs,* the corrected search warrant affidavit contains some indicia of probable cause such that a reasonable officer could have believed that probable cause existed.

### B. *Arrest Without Probable Cause*

On July 16, 1992, the Camden County Grand Jury considered a three count indictment against Sheriff Smith. Count I charged Smith with the offense of Violation of Oath by Public Officer for his failure to collect 64 bail bond forfeitures (fi. fas.). Count II charged Smith with Theft by Taking for mishandling the money in the vending machine account, and Count III charged him with willfully making a false writing to be signed by Bobby Graham. Defendant, Sweat, testified for the prosecution and Smith testified on his own behalf. After the testimony, the Grand Jury returned a "No Bill" on Counts II and III. As to Count I, the Grand Jury returned a "True Bill," thereby indicting Smith for violating his oath of office. Smith was subsequently arrested pursuant to the one count indictment.

■ Smith claims that he was arrested without probable cause in violation of his Constitutional rights. Specifically, he claims that the "True Bill as to the revised Count I, pertaining to 64 uncollected bail bond fi. fas. was obtained dishonestly and through the deliberate misleading of the Grand Jury, thereby defeating any claim of probable cause." (Pl.'s Br. in Supp. of Mot. for Partial Summ.J. at 2) He contends that Defendants obtained the one count indictment "through a material withholding of relevant evidence" and by "deliberate misrepresentation of facts to the Grand Jury." (*Id.* at 3) As the Court has already held, however, absolute witness immunity and absolute prosecutorial immunity protect Defendants from any liability based upon activities before the Grand Jury. *See* Order, CV 293–87 (Nov. 10, 1993).

Smith appears to make an additional argument in an effort to keep this cause of action alive despite absolute immunity. In his brief, Smith argues that "it is the participation in the activities that caused the arrest warrant itself to be issued by the Superior Court judge ... and defendant Sweat's then taking Sheriff Smith into custody based on this arrest warrant knowing that there was no probable cause for same, that form the basis for the cause of action." (Pl.'s Br. in Opp. to Defs.' Mot. for Summ.J. at 94–95) It appears that Smith is arguing that the execution of the arrest warrant violated his Constitutional rights under the Fourth Amendment. In sum, Smith claims that Defendants executed a facially valid warrant knowing that it was not supported by probable cause. Defendants have raised the defense of qualified immunity which requires the Court to determine whether Defendants violated clearly established Constitutional law.

### 1. Clearly Established Law

■ Certainly, the arrest of Sheriff Smith without probable cause gives rise to a cause of action under § 1983. However, the Court cannot rely on general propositions or "useless [bits] of abstract information" in deciding whether the law is clearly established. *Lassiter,* 28 F.3d at 1151. Again, the Court must articulate a more particularized factual situation to evaluate. As discussed below, Smith has identified a countless number of facts and legal conclusions which he contends strips his arrest of probable cause. He has not, however, produced any cases which are factually similar to this one. Smith appears to be operating under the assumption that since his right to be free from arrests without probable cause is clearly established, his burden on this issue is discharged. This is not the case:

> The most common error we encounter, as a reviewing court, occurs on this point: courts must not permit plaintiffs to discharge their burden by referring to general rules and to the violation of abstract "rights."

. . . . .

If case law, in factual terms, has not staked out a bright line, qualified immunity

almost always protects the defendant. The line is not to be found in abstractions—to act reasonably, to act with probable cause, and so forth—but in studying how these abstractions have been applied in concrete circumstances. And, as the en banc court recently accepted:

> When considering whether the law is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar. *See, e.g., Edwards v. Gilbert,* 867 F.2d 1271, 1277 (11th Cir.1989). *Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.*
>
> *Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1573, 1575 (11th Cir.1992) (Edmondson, J., dissenting) (emphasis added), *approved en banc,* 998 F.2d 923 (11th Cir.1993).

*Lassiter,* 28 F.3d at 1150 (internal footnotes omitted; some internal citations omitted).

Accordingly, the Court concludes that Smith has failed to discharge his burden of establishing that the rights allegedly violated by Defendants were clearly established.

### 2. Objective Reasonableness

■ The Court also finds that Smith's arrest was objectively reasonable. The test for qualified immunity is "whether a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). Actual probable cause is not necessary. Rather, even when probable

cause has been found to be lacking, a police officer has qualified immunity if it was objectively reasonable for the officer to believe that probable cause existed, or if officers of reasonable competence could disagree on whether the probable cause test was met. *See Malley,* 475 U.S. at 341, 106 S.Ct. at 1096. Accordingly, for qualified immunity to be lost, the Court would have to find that a reasonable officer *could not have concluded* that Smith violated his oath of office by failing to collect bail bond forfeitures.

■ In evaluating what a reasonable officer would believe, the Court considers the facts in the light most favorable to Smith. It cannot, however, consider the Defendants' subjective beliefs. *See Harlow,* 457 U.S. at 815–20, 102 S.Ct. at 2736–39 (Subjective intent and beliefs regarding the validity of the arrest are irrelevant.). Accordingly, it is irrelevant whether Defendants actually believed that there was probable cause for Smith's arrest.

Smith was arrested for violating his oath of office by failing to collect bail bond forfeitures (fi. fas.). Accordingly, the Court must answer the following question: Could a reasonable officer have found that there was probable cause to believe that Smith did indeed violate his oath of office by failing to collect bail bond forfeitures? As discussed below, the answer to this question must be in the affirmative.

■ The parties appear to agree that under Georgia law, (1) a fi. fa. is a writ, (2) the sheriff's oath of office requires sheriffs to collect outstanding writs, and (3) violation of this oath of office is a criminal offense.[5] It is further undisputed that during the search of Smith's office in March of 1992, officials

---

5. The relevant Georgia statutes read as follows:

**O.C.G.A. § 15–16–4 Oath of office.**

Before entering on the duties of their office the sheriffs shall take and subscribe, in addition to the oath required of all civil officers, the following oath before the judge of the superior court or the judge of the probate court:

"I do swear that I will faithfully execute all writs, warrants, precepts, and processes directed to me as sheriff of this county, or which are directed to all sheriffs of this states, or to any other sheriff specially,

which I can lawfully execute, and true returns make, and in all things well and truly, without malice or partiality, perform the duties of the office of sheriff of _____ County, during my continuance therein, and take only my lawful fees. So help me God."

**O.C.G.A. § 16–10–1 Violation of oath by public officer.**

Any public officer who willfully and intentionally violates the terms of his oath as prescribed by law shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years.

seized a single box full of unexecuted fi. fas. Based on these undisputed facts alone, a reasonable officer could have found that there was probable cause to believe that Smith violated his oath of office by failing to collect the fi. fas. Accordingly, Defendants are entitled to qualified immunity for the arrest of Smith.

Smith, of course, argues against this conclusion. Although it is difficult to itemize Smith's arguments due to the manner in which they are presented, the Court will attempt to address his concerns.[6]

As a preliminary matter, the Court notes that Smith does not argue that he indeed executed the fi. fas. listed in the indictment. Rather, Smith makes several arguments that appear to be possible defenses or explanations as to why he did not execute the fi. fas. Smith claims that Defendants knew but ignored his pragmatic problems such as whether he should spend county funds to collect fi. fas. that were in essence uncollectible. He claims that Defendants also knew but ignored the fact that the Sheriff's department did not have the funds to hire an attorney to run title searches. Smith also claims that many of the fi. fas. were, in fact, uncollectible.

 Assuming all of this to be true, it appears that Smith is alleging facts which would constitute possible "defenses" to the crime for which he was indicted. The existence of possible defenses to a crime, however, does not preclude a reasonable officer from finding probable cause to believe that a defendant indeed committed that crime. Rather, probable cause to arrest exists when the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief *that an offense has been committed*. *See Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir.1990) (citing *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949) and *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)).

#### a. *Statute of Limitations*

Smith also claims his arrest was without probable cause because the statute of limitations had run as to his alleged violation of oath of office. The parties appear to agree that Violation of Oath by Public Officer under O.C.G.A. § 16–10–1 is a felony. Under O.C.G.A. § 17–3–1(c), prosecution for felonies must be commenced within four years after the commission of the crime. Most of the 64 fi. fas. listed in the indictment were issued more than four years before the date of Smith's indictment. Accordingly, Smith argues that all but three or four of the fi. fas. are so old that any prosecution of him would have been time-barred. Nevertheless, Defendants presented the violation of oath of office count to the Grand Jury knowing that the statute of limitations had run.

Defendants argue that the statute of limitations had not necessarily run because under the tolling provision in O.C.G.A. § 17–3–2(2), the statute does not begin to run until an offense is known to the prosecutor or to someone interested in the prosecution. *State v. Brannon*, 154 Ga.App. 285, 267 S.E.2d 888 (1980). In the indictment, Defendants state that Smith's failure to collect the fi. fas. was "unknown until and after April 1, 1991." (Deering Aff. Ex. C at 2) Accordingly, Defendants argue that the statute of limitations does not bar Count I of the indictment and, therefore, does not undercut probable cause.

In response, Smith claims that Defendants lied when drafting the indictment because they did indeed know about the fi. fas. prior to April 1, 1991. In support of this argument, Smith has produced (1) two letters regarding the fi. fa. matter written before April 1, 1991, and (2) the November of 1989 grand jury presentments which also discuss the fi. fa. matter. As discussed below, however, even if Defendants had knowledge of these three items, arguable probable cause remains.

The first letter regarding the fi. fa. matter was written by the Chief Assistant District

---

**6.** Because of absolute witness immunity, the Court will not address the various lies that De-

fendant, Sweat, allegedly told the Grand Jury.

Attorney, John Johnson, in April of 1988. In this letter, John Johnson asked Sheriff Smith to take the "proper steps to perfect the levy of these FiFas so that the County can have benefit of the monies collected and we can close our case files." (Charlie Easterling Aff. Ex. A) Johnson also attached a list of unexecuted fi. fas. Defendants claim that they were unaware of the Johnson letter at the time of the indictment. They also argue that even if they did have knowledge of the letter, they would not thereby have knowledge of the crime:

> The crime for which Plaintiff was indicted was not that there existed Fi.Fa.'s to be collected (which is all that John Johnson's letter shows), but that Plaintiff willingly refused to execute lawful writs in the form of bond forfeiture Fi.Fa.'s. This 'crime' would not become 'known' until someone in authority became chargeable with knowledge not only that Fi.Fa.'s were uncollected, but that Plaintiff refused to collect them.

(Def.s' Br. in Opp. to Pl.'s Mot. for Partial Summ.J. at 10.)

■ After reviewing the Johnson letter and the attached list of fi. fas., the Court notes that Johnson's letter included only 11 of the 64 fi. fas. listed in the indictment. Accordingly, the Court finds that even if Defendants had knowledge of Johnson's letter, this knowledge cannot negate arguable probable cause (on statute of limitations grounds) as to the remaining 53 fi. fas. listed in the indictment.

Smith has also produced a letter written by Superior Court Judge A. Blenn Taylor to the Camden County Board of Commissioners in January of 1989. This letter states, in pertinent part:

> I am writing to you concerning a problem which I feel should be called to the attention of the Commissioners of Camden County.
>
> I am enclosing herewith a list of forfeited bonds recorded on the General Execution Docket from January 1, 1981 to June 1, 1986.... As of this date, these forfeitures have not been collected and canceled in the office of the Clerk of Superior Court of Camden County.
>
> It is my interpretation of the law that once the District Attorney has presented the final order for bond forfeiture to a Superior Court Judge, his responsibility ends. Therefore, it is up to the Sheriff of the county and his legal counsel, the county attorney, to collect these sums. As you can see, there is outstanding the sum of $165,408.00 for the time period stated.

(Charlie Easterling Aff. Ex. B.)

Like Johnson, Judge Taylor also attached a list of fi. fas. Assuming Defendants were aware of this letter the day it was written, and assuming further that this letter signifies that a crime has been committed, the statute of limitations would have begun running in January of 1989. Even so, Smith's indictment in July of 1992 would have still been timely, for this hypothetical four year period would not expire until January of 1993.

■ Finally, Smith relies on the November 3, 1989, presentments of the Camden County Grand Jury in which it recommended "that the County Commissioners, the County attorney, the District Attorney and the Sheriff meet and resolve and/or collect all outstanding bail bonds." (John Johnson Aff. Ex.) Again, assuming that Defendants knew about the 1989 Grand Jury recommendation and assuming that such recommendation signifies that a crime has been committed, the four year statute of limitations would begin running in November of 1989. Smith's indictment in July of 1992 is nevertheless timely, for this four year period would not expire until November of 1993.

In conclusion, Smith's statute of limitations argument fails to negate arguable probable cause.

b. *Statutory Excuses*

Smith and his attorneys have also carefully scrutinized each of the 64 fi. fas. in the indictment and now [7] argue that most of the fi. fas. are either invalid or unenforceable by operation of three Georgia statutes:

---

7. As Defendants point out, Smith did not mention any of these statutory "excuses" during the sworn statement he made in his own defense before the Grand Jury.

O.C.G.A. § 17–6–71, O.C.G.A. § 17–6–72 and O.C.G.A. § 15–6–62. Specifically, Smith claims that O.C.G.A. § 17–6–71 justifies his failure to collect the fi. fas. in case Nos. 86R92 and 87R44 because no Rule Absolute had been entered in those cases.[8] He further argues that O.C.G.A. § 17–6–72 justifies his failure to collect the fi. fas. in case Nos. 88R14 and 87R491 because the criminal defendant was in federal custody when his case was called for trial.[9] Furthermore, according to Smith, O.C.G.A. § 15–6–62 implies that the Judge of the Probate Court is not empowered to issue bail bond fi. fas., thereby justifying his failure to collect 21 of the 64 fi. fas.[10] Finally, Smith argues that under the "one year, two year" rule, O.C.G.A. § 17–6–72(c), 33 fi. fas. in the indictment are unenforceable as a matter of law because these 33 cases were not called for trial until after the one or two year period elapsed.[11]

■ Defendants, of course, dispute Smith's legal analysis and interpretation of these statutes. Smith has indeed failed to show the Court that his view of the applicable Georgia law is clearly established. Nevertheless, even if Smith's interpretation is accepted, Defendants still enjoy qualified immunity if a "reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *See Anderson*, 483 U.S. 635 at 641, 107 S.Ct. 3034 at 3040. As discussed below, the Court finds that despite the existence of these statutes and their possible legal effect upon the fi. fas., a reasonable officer, nevertheless, could have believed that probable cause existed. *See Malley*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986).

Perhaps determinative of this issue is Judge Taylor's letter to the Camden County Board of Commissioners written on January 27, 1989. The Court has reviewed the list of fi. fas. attached to Judge Taylor's letter and notes that his list includes 37 of the 64 fi. fas. for which Smith was indicted. In the letter, the judge expresses his legal opinion as to the status of the fi. fas.:

I am enclosing herewith a list of forfeited bonds recorded on the General Execution Docket from January 1, 1981 to June 1, 1986. There forfeitures have identified by them the case number and amount of bond

---

8. **O.C.G.A. § 17–6–71. Execution hearing on failure of principal to appear.**

 (a) The judge shall, at the end of the court day, upon the failure of the principal to appear, order an execution hearing not sooner than 90 days but not later than 150 days after such failure to appear. Notice of the execution hearing shall be served by certified mail to the surety at the address listed on the bond or by personal service to the surety within ten days of such failure to appear at its home office or to its designated registered agent.

 (b) If at the execution hearing it is determined that judgment should be entered, the judge shall so order.

9. **O.C.G.A. § 17–6–72. Conditions not warranting forfeiture of bond for failure to appear; remission of forfeiture.**

 . . . . .

 (b) No judgment shall be rendered on a forfeiture of any appearance bond if it is shown to the satisfaction of the court that the principal on the bond was prevented from attending because he or she was detained by reason of arrest, sentence, or confinement in a penal institution or jail in the State of Georgia, or so detained in another jurisdiction, or because he or she was involuntarily confined or detained pursuant to court order in an mental institution in the State of Georgia or in another jurisdiction. . . .

10. **O.C.G.A. § 15–9–62. Issuance of execution for costs; trial of illegality or defense in superior court.**

 (a) Whenever any costs are due the judge of the probate court by executors, administrators, or guardians, upon failure to pay the same on demand made, he in empowered to issue a writ of fieri facias at any regular term of court against the executors, administrators, or guardians for the amount due for costs at the time of the demand.

11. **O.C.G.A. § 17–6–72. Conditions not warranting forfeiture of bond for failure to appear; remission of forfeiture.**

 . . . . .

 (c) If the prosecution does not try the charges against a defendant within a period of two years in the case of felonies and one year in the case of misdemeanors after the date of posting bond, judgment rendered after such period may not be enforced against the surety on the bond and the surety shall thereafter be relieved of liability on the bond. This provision shall not apply where the prosecution's failure to try the charges is due to the fault of the principal.

forfeited. As of this date, these forfeitures have not been collected and canceled in the office of the Clerk of Superior Court of Camden County.

*It is my interpretation* of that law once the District Attorney has presented the final order for bond forfeiture to a Superior Court Judge, his responsibility ends. Therefore, *it is up to the Sheriff of the county and his legal counsel, the county attorney, to collect these sums.*

(Charlie Easterling Aff. Ex. B.) (emphasis added).

■ Based on the above excerpts, it appears that Judge Taylor considered the fi. fas. listed in his letter to be valid and collectable. If a superior court judge did not notice any legal problems which would render the fi. fas. invalid or unenforceable, the Court finds it unreasonable to expect Defendants to do so. *See Barts v. Joyner,* 865 F.2d 1187, 1193 (11th Cir.1989) ("We cannot realistically expect that reasonable police officers know more than reasonable judges about the law."). Accordingly, even on the basis of these 37 fi. fas. alone, Defendants are entitled to qualified immunity because their actions were objectively reasonable.

### C. Bad Faith/Malicious Prosecution

■ On January 24, 1994, a plurality of the United States Supreme Court held that "it is the Fourth Amendment, and not substantive due process, under which [malicious prosecution] claims must be judged.... Substantive due process with its 'scarce and open-ended' 'guideposts' can afford [plaintiff's] no relief." *Albright v. Oliver,* 510 U.S. ——, —— & ——, 114 S.Ct. 807, 809 & 814, 127 L.Ed.2d 114, 122 & 124 (1994) (internal citations omitted). In accordance with *Albright,* the Court must judge Smith's malicious prosecution claim under the Fourth Amendment. Smith has identified two Fourth Amendment violations: (1) search of his residence without probable cause, and (2) arrest without probable cause. As discussed above, however, Defendants are entitled to qualified immunity with respect to both of these claims. Accordingly, qualified immunity must apply to Smith's malicious prosecution claim as well.

### D. Deprivation of Liberty Without Due Process

The Fourteenth Amendment protects against deprivation of liberty without due process of law. Smith's alleged deprivation of liberty is based on custody after arrest, transport to Glynn County for booking, and the restrictions imposed by the conditions of his $5,000 bond. This "deprivation of liberty" was "without due process" because Smith was allegedly arrested without probable cause. Again, Defendants have raised the defense of qualified immunity.

■ The Court notes that Smith's deprivation of liberty claim is essentially the same as his claim for false arrest and involves the same set of facts. As Smith himself points out, "it is noted that the deprivation of liberty herein is the same as that resulting from the unlawful arrest, and that the qualified immunity argument pertaining to the Fourth Amendment violation set out in Part B(3)(c) is equally applicable herein and is also incorporated herein by reference." (Pl.'s Br. in Opp. to Defs.' Mot. for Summ.J. at 103) Accordingly, since qualified immunity applies to false arrest, it also applies to deprivation of liberty caused by this false arrest.

## V. CONSPIRACY

In ruling on Defendants' Motion to Dismiss in November of 1993, the Court noted that Smith's conspiracy claim is contingent upon the viability of the respective claims discussed above. *See* Order, CV 293–87 (Nov. 10, 1993). Because all other claims in this case fail on the basis of qualified or absolute immunity, Smith's conspiracy claim fails as well.

### CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment is GRANTED. The Court finds it unnecessary to rule on Plaintiff's Motion for Partial Summary Judgment. The Clerk is directed to enter a judgment of dismissal.